## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LOUCACE AMPE**, | |
| **Petitioner**, | |
| v. | Civil Action No. 14-717 (RDM) |
| **JEH JOHNSON**, Secretary, Department of Homeland Security, *et al.*, | |
| **Respondents**. | |

## <u>MEMORANDUM OPINION</u>

Loucace Ampe petitioned this court under 8 U.S.C. § 1421(c) to review the denial of her application for naturalization by Defendant United States Citizenship and Immigration Services ("USCIS"). As relevant here, to qualify for naturalization under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, an applicant must have "been lawfully admitted to the United States for permanent residence," 8 U.S.C. §§ 1427, 1429, and must be "of good moral character," *id.* at § 1427(a).[1] Petitioner obtained lawful permanent resident ("LPR") status roughly seven years before applying for naturalization, premising her LPR application on her marriage to Idriss Martin Sy, himself already an LPR. When she applied and completed an interview for LPR status, however, she failed to disclose that she had two children with another man while still married to Sy. When she later applied for naturalization, her written application revealed that she was no longer married to Sy but did not disclose that she had since remarried

---

[1] For ease of reference, the Court cites to the U.S. Code throughout and does not use citations to the INA.

her children's father, who was in the United States illegally. She later disclosed this fact during her naturalization interview.

According to the government, this history precludes Petitioner from naturalizing for three reasons. First, the government argues that Petitioner was not "lawfully admitted to the United States for permanent residence" under 8 U.S.C. § 1427 and § 1429 because her permanent residence application sought "to procure" an immigration "benefit" either "by fraud or willfully misrepresenting a material fact," which would render her inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i). Second, the government argues that even in the absence of an intent to mislead, Petitioner was not "lawfully admitted" because her failure to disclose the fact that she had two children with another man "shut off a line of inquiry" that might have led USCIS to question the *bona fides* of her marriage to Sy and thus might have led to the denial of her LPR application. Finally, the government argues that Petitioner also lacks the "good moral character" required to naturalize under 8 U.S.C. § 1427(a) because she purportedly lied to USCIS by failing to disclose her children in the course of her adjustment to permanent residence status and also because she initially failed to disclose that she had remarried when she filed for naturalization. Petitioner disputes each of these contentions.

In the typical case challenging an administrative decision, the merits of the parties' respective positions would be analyzed through the lens of agency deference, and the Court would merely need to decide whether the agency's decision was reasonable and supported by substantial evidence. The dispute, moreover, would likely be resolved on the administrative record and the parties' cross-motions for summary judgment. The INA, however, requires a court to apply a more searching standard when considering the denial of an application for naturalization. In place of the typical, deferential standards, the INA requires that a court

exercise *de novo* review and "make its own findings of fact and conclusions of law." 8 U.S.C. § 1421(c).

Now before the Court is the government's motion to dismiss or, in the alternative, for summary judgment, which argues that there are no disputed issues of material fact and that it is entitled to prevail as a matter of law on each of the three stated grounds for denying Petitioner's application. *See* Dkt. 11. The Court concludes that it must consult "matters outside the pleadings" to decide this motion, and so it will treat the motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d). Looking to the merits, the Court holds that the record developed to date is inadequate for it to conclude, without a factual hearing, that Petitioner committed fraud or willful misrepresentation for the purpose of obtaining an immigration benefit. The Court further concludes that the government's second argument—that Petitioner was inadmissible because her misstatement, even if non-fraudulent, was material to her application—misstates the relevant legal standard because it is relevant only if the government has already shown that Petitioner acted fraudulently or willfully. The Court thus concludes that the materiality of any misrepresentation in an LPR application is not an independent basis to deny a Naturalization application. Finally, the Court concludes that there remain genuine disputes of material fact as to whether Petitioner has demonstrated good moral character. The government's motion for summary judgment is accordingly **DENIED**.

## I. BACKGROUND

Petitioner Loucace Ampe, a native and citizen of the Ivory Coast, married Sy, a lawful permanent resident of the United States, on January 12, 1998. Dkt. 1-1 at 16. Sy later filed Form I-130 Petition for Alien Relative on Petitioner's behalf to sponsor her for an immigrant visa. *See* Dkt. 15-3 at 2. That petition was approved on July 24, 1998. Dkt. 1-1 at 16. Five

years later, and eight months after giving birth to her first child, Petitioner applied for LPR

status. Dkt. 11-5 at 3. The application form—Form I-485, Application to Register Permanent

Residence or Adjust Status ("LPR Form")—instructed Petitioner to "list your present

husband/wife, all your sons and daughters (if you have none, write 'none'. If additional space is

needed, use separate paper)." *Id.* In response to that instruction Petitioner listed Sy but did not

list any children or write "none"; she simply left the remaining spaces blank. *Id*. After she

submitted the form, but before a USCIS officer interviewed her in connection with it, Petitioner

gave birth to a second child. Dkt. 1-1 at 16. At her LPR interview on June 23, 2005,

approximately three months after the birth of her second child, Petitioner again failed to disclose

her children to the USCIS officer, and she confirmed the answers she had submitted on the LPR

Form. *Id.* Petitioner was granted LPR status on September 15, 2005. Dkt. 1 at 2 (Petition for

Rev. ¶ 4).

      Petitioner applied for citizenship on March 19, 2012. Dkt. 1-1 at 16. She represented

that she was eligible for naturalization because she had lived in the country for at least five years

as an LPR. Dkt. 11-2 at 2. On the N-400 application form ("Naturalization Form"), she

provided complete information about her two children and accurately stated that she had

divorced Sy, but she did not disclose that she had since married a different man—Joseph N'Da,

the father of both of her children. *See* Dkt. 11-2 at 3, 5 (listing marital status as "divorced,"

indicating that she had been married only once, and not listing a "current spouse"). During her

subsequent citizenship interview on June 12, 2012, Petitioner indicated to a USCIS officer that

both of her children were born during her marriage to Sy but were fathered by N'Da. Dkt. 1-1 at

15; Dkt. 11-3 at 1. She also revealed that she was now married to N'Da. *See* Dkt. 15-2 at 2

(Ampe Aff. ¶ 2).

USCIS denied Petitioner's application for naturalization on June 14, 2012.  *See* Dkt. 1-1 at 15–17.  It concluded that Petitioner was ineligible for naturalization because she had not been "lawfully admitted to the United States for permanent residence in accordance with all applicable provisions" of the INA, as required under 8 U.S.C. § 1429, because she had "willfully misrepresented a material fact" in applying for LPR status, in violation of 8 U.S.C. 1182(a)(6)(C)(i).  Dkt. 1-1 at 17.  The agency based its decision on the fact that Petitioner had not disclosed her first child on her LPR Form or mentioned either child during her LPR interview, and it concluded that such an omission was material because it called into question the *bona fides* of her marriage to Sy.  *Id.*  Petitioner sought a hearing on that decision.  Dkt. 11-4 at 2–3.  In her request for a hearing, she explained that her failure to disclose the existence of her children was "due simply to a misunderstanding of the application itself and not a willful misrepresentation," and took issue with USCIS's attempt to question the *bona fides* of her marriage to Sy.  Dkt. 11-4 at 3.  She also submitted a sworn statement explaining that she did not list her current husband, Joseph N'Da, on her original application for citizenship because "[h]e is a[n] overstay I did not want to put in the application."  *Id.* at 5.  Following the hearing, USCIS reaffirmed the denial of her application on November 21, 2013.  Dkt. 1-1 at 2.

Petitioner sought review of USCIS's seemingly final decision with this Court on April 3, 2014.  *See* Dkt. 1.  The government moved for and was granted an extension of time to answer until October 20, 2014, in light of USCIS's representation that it was "taking a fresh look at [Ampe's] application."  Dkt. 6 at 1–2; August 19, 2014 Minute Order.  USCIS subsequently interviewed Petitioner a second time, *see* Dkt. 9 at 1, purportedly to "resolve the case without further litigation," *see* Dkt. 11 at 11.  On October 6, 2014, USCIS reaffirmed the denial, but rather than further addressing its prior findings, the agency added a new, independent rationale

for its finding:  In addition to affirming its original conclusion that Petitioner had not been

lawfully admitted as an LPR, USCIS found that she did not meet the "good moral character"

requirement for naturalization set forth in 8 U.S.C. § 1427(a)(3) because of her alleged

misrepresentations and because she had allegedly attempted to "conceal, harbor, or shield from

detection" an illegally present alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), when she did

not list N'Da on her naturalization application.  *Id.* at 5–7.  After USCIS issued its decision, the

government moved to dismiss or, in the alternative, for summary judgment in this case.  Dkts.

11, 12.

     The government's motion is now before the Court.  After considering the parties' briefs,

the Court convened a teleconference with the parties to pose several questions about the pending

motion, *see* Dkt. 19 (Hearing Tr. of Sept. 11, 2015), and then convened a further teleconference

to allow the parties to address the Court's questions, *see* Dkt. 20 (Hearing Tr. of Sept. 17, 2015).

## II.  STANDARD OF REVIEW

     This Court reviews an application for naturalization *de novo* and makes "its own findings

of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing *de*

*novo* on the application."  8 U.S.C. § 1421(c).  "This grant of authority is unusual in its scope—

rarely does a district court review an agency decision *de novo* and make its own findings of fact."

*Nagahi v. INS*, 219 F.3d 1166, 1169 (10th Cir. 2000).  Indeed, *de novo* review of a denial of a

naturalization application "is in stark contrast to the appeal process for orders of deportation and

petitions for asylum, in which federal courts accord the Attorney General great deference."

*O'Sullivan v. USCIS*, 453 F.3d 809, 811 (7th Cir. 2006).  The Court does not defer to any of

USCIS's findings or conclusions in reviewing an application for naturalization.  "[T]he burden is

on the alien applicant," however, "to show [her] eligibility for citizenship in every respect," and

any "doubts should be resolved in favor of the United States and against the claimant." *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967) (internal quotation marks omitted).

Although 8 U.S.C. § 1421(c) mandates that the reviewing court "shall, at the request of the petitioner, conduct a hearing *de novo* on the application," federal courts have declined to interpret the provision as requiring an evidentiary hearing where there is no genuine dispute as to any material facts, *see Chan v. Gantner*, 464 F.3d 289, 295–96 (2d Cir. 2006) (holding that the mere use of the word "hearing" in the statute "does not mandate an evidentiary hearing be held"); *see also Beleshi v. Holder*, No. 12-11681, 2014 WL 4638359, at *4 (E.D. Mich. Sept. 16, 2014).  The Court agrees that, in the absence of a factual dispute, there would be no reason to hold a hearing and, accordingly, the government's motion for summary judgment is properly before the Court.  The Court will grant such a motion only if the pleadings and any declarations or other evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the non-moving party." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (internal citation and quotation marks omitted).  Thus, although Petitioner bears the ultimate burden of persuasion to show that she is eligible for citizenship, *Berenyi*, 385 U.S. at 637, at the summary judgment stage the burden is on the government to show that Petitioner will not be able to make that showing as a matter of law.

## III.  DISCUSSION

The government argues that Petitioner is ineligible for citizenship for three reasons. First, it contends that Petitioner was not "lawfully admitted" as a permanent resident because she obtained an immigration benefit—her LPR status—through either "fraud or willful

misrepresentation."  *See* 8 U.S.C. 1182(a)(6)(C)(i).  Next, it argues that Petitioner was not

"lawfully admitted . . . in accordance with all applicable provisions of" the INA, *id.* § 1429, even

if she did not intentionally mislead USCIS because inaccuracies in her LPR application were

material since they shut off a relevant line of inquiry.  And finally, the government maintains that

even if Petitioner was "lawfully admitted," she is barred from naturalization because she has

failed to demonstrate "good moral character."  *See id.* § 1427(a).

## A.  Disputed Material Facts Exist as to Whether Petitioner Was Inadmissible

The government suggests in its opening brief, and more clearly states in its reply, that

Petitioner's LPR status was not lawfully obtained—and therefore she is ineligible for

naturalization—for two separate but related reasons.  First, the government argues that Petitioner

fraudulently or intentionally misrepresented a material fact when she did not disclose on her LPR

Form that she had a child and did not tell her LPR interviewer that she had two children.

Second, the government argues she is inadmissible because she "shut off a line of inquiry" when

she made the same misstatement, regardless of whether she did so intentionally.  *See* Dkt. 11 at

20–32; Dkt. 16 at 9–15.  As explained below, however, the government's effort to treat these

points as independent grounds to deny Petitioner's application for citizenship rests on a

misunderstanding of the law.  The government can only prevail based on its second contention—

that Petitioner's misstatements were material because they cut off a line of inquiry—if it is *also*

correct in its first contention—that Petitioner made willful misrepresentations to obtain an

immigration benefit.  The Court concludes that the government's first contention implicates

disputed issues of material fact, and is thus not suited for summary judgment.  This necessarily

thwarts the second contention as well.

1.   *Legal Framework*

The INA provides that, except as specified, "no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of [the INA]." 8 U.S.C. § 1429.  The government does not seek to revoke Petitioner's LPR status, nor could it in light of the expiration of the five-year statutory limitation on rescission of adjustment of status.  *See* 8 U.S.C. § 1256(a).  It asserts instead that the relevant question is whether Petitioner's adjustment to LPR status was "procedurally and substantively proper." Dkt. 11 at 16.  Under this view, Petitioner's factual status as an LPR is not dispositive as to whether she was "lawfully admitted . . .  in accordance with all applicable provisions of [the INA]." 8 U.S.C. § 1429.  The Court agrees that this is the controlling standard.

Congress defined the phrase "lawfully admitted for permanent residence," which appears in several operative provisions of the INA, to mean "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws." 8 U.S.C. § 1101(a)(20).  More than thirty years ago, the Fifth Circuit declined to adopt a "narrow reading of the term 'lawfully admitted,'" and instead construed the phrase to require not only "procedural regularity," but also "compliance with substantive legal requirements." *Matter of Longstaff*, 716 F.2d 1439, 1441 (5th Cir. 1983).[2]  Three years later, the Court of Appeals for the Ninth Circuit followed suit, holding that an immigrant who concealed a prior drug conviction at the time he adjusted to LPR status was not "lawfully admitted" within the meaning of 8 U.S.C. § 1101(a)(2). *Monet v. INS*, 791 F.2d 752, 753 (9th Cir. 1986).  The

---

[2]  Although the petitioner in *Longstaff* was treated as excludable based on his sexual preference, that basis for exclusion was dropped from the INA in 1990. *See* Pub. L. No. 101-649, Sec. 601(a), 104 Stat. 4978, 5067 (1990).

Ninth Circuit reached this conclusion, moreover, even though five years had passed since the applicant had adjusted to LPR status, and he was thus no longer at risk of rescission of that status.  *Id.* at 754.  In 2003, the Board of Immigration Appeals ("BIA") adopted this view of the law and expressly endorsed *Longstaff* and *Monet*.  *See Matter of Koloamatangi*, 23 I. & N. Dec. 548 (BIA 2003).  As the BIA explained, "the term 'lawfully admitted for permanent residence' [does] not apply to aliens who [have] obtained their permanent resident status by fraud or [were] otherwise not . . . entitled to it."  *Id.*

A BIA interpretation of the INA is generally entitled to deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), because the BIA's decisions "give[] ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'"  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (citation omitted).  The fact that the statute granting this Court jurisdiction to review a naturalization hearing requires the Court to "make its own findings of fact and conclusions of law," 8 U.S.C. § 1421(c), however, raises the question whether Congress has withdrawn whatever delegation of interpretative authority might otherwise be inferred under the *Chevron* framework.

For two reasons, the Court concludes that the BIA's reading of the definition of "lawfully admitted" is nonetheless entitled to *Chevron* deference.  First and most significantly, the Supreme Court has held that *de novo* review is compatible with *Chevron* deference, explaining that "[d]e novo proceedings presume a foundation of law," and "[d]eference can be given to" an agency's longstanding construction of its governing statute "without impairing the authority of the court to make factual determinations, and to apply those determinations to the law, *de novo.*" *United States v. Haggar Apparel Co.*, 526 U.S. 380, 391 (1999).  Second, this conclusion applies with particular force in this context, where the phrase at issue appears in the general definitional

10

section of the INA and appears in other provisions that do not call for *de novo* review.  It is unlikely that Congress required a district court reviewing a naturalization determination under 8 U.S.C. § 1421(c) to ignore the BIA's interpretation of the phrase but intended courts exercising judicial review under other provisions of the INA to defer to the BIA's interpretation of the exact same phrase.

Since the BIA's decision in *Matter of Koloamatangi*, every circuit to have considered the issue has agreed that to demonstrate that she was "lawfully admitted for permanent residence," an applicant "must do more than simply show that she was granted LPR status; she must further demonstrate that the grant of that status was 'in substantive compliance with the immigration laws.'"  *Injeti v. USCIS*, 737 F.3d 311, 316 & n.2 (4th Cir. 2013) (collecting cases); *Walker v. Holder*, 589 F.3d 12, 20 (1st Cir. 2009) (noting that the Second, Fifth, Eighth, Ninth, and Eleventh Circuits have reached the same conclusion when interpreting the same phrase in different sections of the INA).  Although some courts have concluded that this interpretation flows unambiguously from the plain language of the INA, most have simply deferred to the BIA's interpretation of the statute under *Chevron*.  *See, e.g.*, *Injeti*, 737 F.3d at 315–16; *De Le Rosa v. DHS*, 489 F.3d 551, 554–55 (2d Cir. 2007); *Arellano-Garcia v. Gonzales*, 429 F.3d 1183, 1186–87 (8th Cir. 2005).  The Court agrees with the majority of the Courts of Appeals that the statutory definition is ambiguous and that the BIA's interpretation—set out in *Matter of Koloamatangi* and its progeny—is reasonable.

The government, accordingly, is entitled to prevail if it can show that there is no genuine dispute of material fact that Petitioner was inadmissible when she applied for LPR status.  If so, she was never "lawfully admitted to the United States . . . in accordance with all applicable provisions of [the INA]" and is therefore ineligible for naturalization.  8 U.S.C. § 1429.

This, then, leads to the core of the issue.  For the government to show that Petitioner's LPR status was substantively defective, it must point to some substantive defect at the time she received it.  In addition to the substantive requirements for adjusting to LPR status, *see* 8 U.S.C. § 1255, Congress has also identified a variety of reasons why an applicant may be ineligible to adjust that status, *see id.* § 1182.  The only defect with Petitioner's LPR status that the government has relied upon in its brief—and, indeed, the only one on which USCIS relied upon below—is that Petitioner was purportedly inadmissible under § 1182(a)(6)(C)(i).  *See* Dkt. 11 at 22; Dkt. 1-1 at 2–4; Dkt. 11-6 at 2, 5–6.  That provision states that "any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) . . . admission into the United States . . . under this chapter is inadmissible."

An applicant runs afoul of 8 U.S.C. § 1182(a)(6)(C)(i) if three conditions are satisfied. First, the applicant must have the necessary state of mind.  Section 1182(a)(6)(C)(i) does not render an alien inadmissible if she makes an innocent mistake on her LPR Form.  In this case, that means the government must show that Petitioner intended to deceive when she wrote that she had no children on her LPR Form or when she failed to disclose that she had two children during her LPR interview.  Second, the misrepresentation must be material.  The Court will address the meaning of materiality in more depth below.  For present purposes, it is sufficient to note that materiality is an element of § 1182(a)(6)(C)(i).  Third and finally, § 1182(a)(6)(C)(i) requires the government to show that any fraudulent or willful misrepresentation of a material fact was done for the purpose of "procur[ing] . . . a visa, other documentation, or admission into the United States or other benefit provided under [the INA]."  It is not enough to show just that Petitioner intentionally misled USCIS officials and that her misstatements were material.  The

government must also show *why* she lied, and that reason must be that she was seeking to obtain an immigration benefit.

As explained below, the government has failed to show the absence of a genuine dispute of material fact as to each of these.

2.  *Fraud or Willful Misrepresentation*

The intent element of § 1182(a)(6)(C)(i) requires the government to show that Petitioner's failure to disclose her children constituted either "fraud" or "willful misrepresentation."  Fraud "consist[s] of false representations of a material fact made with *knowledge of its falsity* and with intent to deceive the other party."  *Matter of G–G–*, 7 I. & N. Dec. 161, 164 (BIA 1956) (emphasis added); *see also United States v. Kiefer*, 228 F.2d 448, 449 (D.C. Cir. 1955).  A misrepresentation is only "willful" if it "involves conscious wrong or evil purpose . . . or at least inexcusable carelessness," and is an even "stronger" requirement than "voluntary or intentional."  *See Willful*, Black's Law Dictionary (10th ed. 2014); *see also Am. Surety Co. of N.Y. v. Sullivan*, 7 F.2d 605, 606 (2nd Cir. 1925) (L. Hand, J.) ("[T]he word 'willful' . . . means no more than that the person charged with the duty knows what he is doing.").  Thus, "willful misrepresentation" requires, at the very least, knowledge of the falsity of the representation, much like fraud.  A person cannot consciously misrepresent something if she does not even know she is making a misrepresentation.  Accordingly, the government is entitled to summary judgment on this basis only if it can demonstrate that there is no genuine dispute of material fact that Petitioner made those misrepresentations with the requisite state of mind.  It has not done so.

As an initial matter, the government suggests that "[a] finding of substantive irregularity for fraud or misrepresentation does not require a showing of an "'intent' to deceive by fraud' or

willfulness." Dkt. 11 at 21 (quoting *Walker*, 589 F.3d at 20).  The Court will explain in the next

section why a material misrepresentation, standing alone absent any scienter, does not constitute

a substantive defect that renders an LPR applicant inadmissible.  But to the extent that the

government is suggesting that it can show Petitioner committed fraud or willful

misrepresentation without showing that she acted fraudulently or willfully, the Court rejects that

contention as inconsistent with the plain meaning of the statute and widely accepted usage.

      Nor has the government shown that Petitioner indisputably acted with the requisite intent.

The relevant text of the LPR Form instructs applicants to "list your present husband/wife, all

your sons and daughters."  Dkt. 11-5 at 3.  Petitioner has proffered a sworn affidavit averring that

she misunderstood the directions on the form as asking whether she had children with her then-

current spouse, Sy.  Dkt. 1-1 at 8–9 (Ampe Aff. at ¶¶ 5–6, 8).  The government repeatedly asserts

that the form was clear, *see* Dkt. 11 at 25–26, 32, and that there were "no limiting instructions,"

suggesting that the form was asking only about children with Petitioner's then-current spouse, *id.*

at 25.  The government also asserts that it would make "no sense to limit this [question] to

children of the current or petitioning spouse when USCIS seeks to gain information that would

either validate or call into question the *bona fides* of the marriage to a petitioning spouse."  *Id.* at

25–26.  It offers no additional evidence, however, to show that Petitioner acted with the requisite

state of mind.  In essence, the government's argument is that the clarity of the form refutes any

plausible contention that her mistake was unintentional.

      Although Petitioner's asserted reading of the LPR Form may not be the most natural, the

Court cannot conclude that there is no genuine dispute of material fact respecting her state of

mind.  The government fails to address the source of Petitioner's asserted confusion.  The word

"your" is both singular and plural, *see* *Your*, Merriam-Webster Dictionary, http://beta.merriam-

webster.com/dictionary/your (last visited Jan. 19, 2016).  Since the phrase "all your sons and daughters" immediately followed the phrase "list your present husband/wife," it is at least possible that Petitioner read the word "your" preceding "sons and daughters" as a plural reference to both her and her spouse.  Even if Petitioner's purported reading of the question is unusual, it is not so blatantly at odds with the language of the question as to foreclose any genuine issue of material fact regarding her state of mind.

Petitioner's contention also finds some support in the fact that she answered truthfully when confronted on the Naturalization Form with the arguably less ambiguous inquiry: "How many sons or daughters have you had?"  *See* Dkt. 11-3 at 1.  As for her failure to disclose her children during her LPR interview, the government has failed to provide any evidence that would shed light on that interview, such as a transcript or a declaration from her interviewer.  If, for instance, the interviewer asked Petitioner, "Do you have any children?" and she answered, "No," that might suggest willful misrepresentation.  If, on the other hand, the interviewer asked, "Is everything you wrote on your LPR Form true and accurate?" and she said, "Yes," that might add little to the issues as currently framed.  Without any evidence concerning the interview, however, the Court can only speculate as to what occurred.

For present purposes, the Court need not decide whether Petitioner's explanation for failing to list her child on the form or to disclose her children during her LPR interview is persuasive.  Her asserted confusion is at least plausible, and thus determining whether she intentionally misrepresented a material fact or merely misunderstood what was being asked turns on her credibility.  Credibility determinations, however, are inapt for summary judgment.  *See, e.g.*, *United States v. Project on Gov't Oversight*, 454 F.3d 306, 313 (D.C. Cir. 2006) ("On summary judgment . . . the court must view the evidence in the light most favorable to the

nonmoving party and must not assess witness credibility." (internal quotation marks omitted));

*Washington Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 326 n.8 (D.C. Cir.

1989) ("[T]he need to assess the credibility of witnesses is precisely what places this dispute

outside the proper realm of summary judgment.").  Because the government has not shown that

Petitioner indisputably committed fraud or willful misrepresentation, it is not entitled to

summary judgment on the basis that Petitioner was inadmissible under 8 U.S.C.

§ 1182(a)(6)(C)(i).

   3.  *Materiality*

   The inquiry into whether the government is entitled to summary judgment on the ground

that Petitioner was inadmissible at the time she received LPR status—and therefore she was

never "lawfully admitted" into the United States as necessary for naturalization—properly ends

here.  As explained above, the only statute the government has ever cited that would have

rendered Petitioner inadmissible is 8 U.S.C. § 1182(a)(6)(C)(i).  That statute requires that the

Court make a finding about Petitioner's state of mind, and that question is both disputed and ill-

suited for resolution on summary judgment.  Thus, in the ordinary course, it would be

unnecessary to consider whether the government has satisfied the other elements of

§ 1182(a)(6)(C)(i).

   The government argues, however, that even if Petitioner did not intentionally

misrepresented facts, she was still not "lawfully admitted to the United States for permanent

residence in accordance with all applicable provisions of" the INA under 8 U.S.C. § 1429—and

is therefore ineligible for naturalization—because the government's decision to grant her LPR

status was based on materially incomplete information.  *See* Dkt. 11 at 19–32; Dkt. 16 at 9–14.

The government's theory is that Petitioner shut off a reasonable line of inquiry that might have

led USCIS to discover a basis for concluding that her marriage to Sy was not *bona fide*, and that, accordingly, she was not entitled to adjust her status.  As explained below, there are two difficulties with this argument.

a.   A Material Misrepresentation Is Not a Standalone Substantive Defect

All parties agree that Petitioner is ineligible for naturalization unless she was "lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of [the INA]."  8 U.S.C. § 1429.  The parties further agree that Petitioner was not "lawfully admitted" if she was inadmissible at the time she applied for LPR status.  The government has not, however, identified a statute or regulation that would render an LPR applicant inadmissible based on a material but unintentional misrepresentation in her application. Instead, the government relies on a number of appellate decisions as support for its contention that a material misrepresentation—without any fault on Petitioner's behalf—is sufficient to establish inadmissibility.  *See* Dkt. 11 at 21 n.16 (citing *Walker*, 589 F.3d at 19; *De La Rosa v. U.S. Dep't of Homeland Sec.*, 489 F.3d 551, 554 (2d Cir. 2007) (per curiam); *Savoury v. U.S. Att'y Gen.*, 449 F.3d 1307, 1317 (11th Cir. 2006); *Arellano-Garcia v. Gonzales*, 429 F.3d 1183, 1186 (8th Cir. 2005); *Longstaff*, 716 F.2d at 1451; *Matter of Wong*, 14 I. & N. Dec. 12 (BIA 1972)); *see also* Dkt. 11 at 23.  None of these cases support the government's position.

The government first relies on *Walker v. Holder*, 589 F.3d 20 (1st Cir. 2009), for the sweeping proposition that "a finding of substantive irregularity for fraud or misrepresentation does not require a showing of intent to deceive by fraud or willfulness."  Dkt. 11 at 21 (internal quotation marks omitted).  That assertion, however, is far more than the First Circuit's analysis in that case can bear.  *Walker* involved man who claimed derivative citizenship under 8 U.S.C. § 1431(a) based on his mother's status as a citizen.  589 F.3d at 15–16.  Under that provision, the

child of a citizen is entitled to derivative citizenship if, among other things, "[t]he child is

residing in the United States . . . pursuant to a *lawful admission for permanent residence*."  8

U.S.C. § 1431(a)(3) (emphasis added).  Walker had been admitted into the United States based

on the false assertion that his grandmother was his mother.  *Id.* at 16–17.  Walker argued that he

had not made any willful misrepresentation in violation of 8 U.S.C. § 1182(a)(6)(C)(i), but the

BIA and the First Circuit both concluded that his culpability was not at issue because he was

inadmissible under a separate provision, 8 U.S.C. § 1182(a)(7)(A)(i)(I), which "does not require

intent to deceive."  *Walker*, 589 F.3d at 20 (quoting and agreeing with the BIA's decision

below).  That separate provision rendered inadmissible any immigrant who did not hold a valid

visa at the time of entry.  *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I).  Walker fell into this category

because he was admitted as the child of an LPR based upon a petition filed by his grandmother,

not his mother.  *Walker*, 589 F.3d at 17–21.  He was thus never lawfully admitted because he did

not satisfy one of the requirements necessary for LPR status—he was not the child of an LPR at

the time of entry.  *See* 8 U.S.C. § 1255(a), *id.* § 1153.

The other cases the government cites presented similar circumstances.  In each one of

them, the applicants were inadmissible because there was a substantive defect—defined by

statute—with their LPR statuses, not because they had misrepresented a material fact.  *See*

*Savoury*, 449 F.3d at 1312–13, 1317 (holding that the petitioner was not "lawfully admitted"

because he had violated a law "relating to a controlled substance," which made him inadmissible

under 8 U.S.C. § 1182(a)(2)(A)(i)(II)); *De La Rosa*, 489 F.3d at 553–55 (holding the petitioner

was not lawfully admitted because she gained her LPR status under the amnesty provision of the

Immigration Reform and Control Act of 1986, which required her to enter the United States

before 1982 when, in fact, she had entered the country sometime after that); *Arellano-Garcia*,

18

429 F.3d at 1185–86 (affirming the BIA's decision that the petitioner had never been lawfully

admitted "as a result of his 1988 drug trafficking conviction"); *Longstaff*, 716 F.2d at 1440–43

(holding that the petitioner was not lawfully admitted because he was an "alien[] afflicted with

psychopathic personality," which made him inadmissible under 8 U.S.C. § 1182(a)(4) (1976));

*Wong*, 14 I. & N. Dec. at 13–14 (holding that a mother and her children were inadmissible

because the visa upon which their admissibility was premised required them—under since-

repealed 8 U.S.C. § 1153(a)(9)—to enter the United States accompanied by a legal immigrant

when, in fact, they had not so entered).

      In contrast to these cases, the government has failed to identify any statute or regulation

that would render Petitioner's LPR status substantively defective beyond the contention that she

fraudulently or willfully misled the government in violation of 8 U.S.C. § 1182(a)(6)(C)(i).  The

government has never asserted, for example, that Petitioner failed to meet the various

requirements for LPR status provided in 8 U.S.C. § 1255.  Absent undisputed evidence that

Petitioner violated § 1182(a)(6)(C)(i) or was inadmissible under some other statutory or

regulatory provision, or that she did not satisfy one of the requirements for LPR status in § 1255,

the government's mere assertion that Petitioner's misstatement was material is not germane to

whether she was "lawfully admitted" when she gained LPR status.

      The government does identify one case that comes closer to supporting its position.  In

*Injeti*, the Fourth Circuit held that a woman was inadmissible when she admittedly made a

misstatement on her LPR Form but claimed it was her attorney's mistake.  *See Injeti*, 737 F.3d at

316.  Central to the government's argument here, the Fourth Circuit held that "it [was not]

necessary for the district court to determine whether Injeti's misrepresentation was fraudulent or

willful."  *Id.* at 317.  The court's holding, however, did not turn on an application of 8 U.S.C.

§ 1182(a)(6)(C)(i), as the government asserts here, but on 8 U.S.C. § 1255, which provides the

Attorney General authority to grant an LPR application "at his discretion and *under such*

*regulations as he may prescribe*." *See id.* at 318 (quoting 8 U.S.C. § 1255 (emphasis in *Injeti*)).

The Fourth Circuit further explained that one such regulation provides that "[b]y signing the

[LPR Form], the applicant . . . certifies under penalty of perjury that the benefit request, and all

evidence submitted with it, either at the time of filing or thereafter, is true and correct." *Id.* at

318 (quoting 8 C.F.R. § 103.2(a)(2)).  In the Fourth Circuit's view, Injeti's LPR application was

substantively defective—and thus she was not "lawfully admitted" for the purposes of

naturalization—because her misstatement meant that the information on her LPR Form was not

true and correct.  *Id.*  This, in turn, meant that she had not satisfied the requirements of 8 C.F.R.

§ 103.2(a)(2), which is a "regulation[] . . . prescribe[d]" by the Attorney General, 8 U.S.C.

§ 1255.  Injeti's failure to satisfy this regulatory requirement, the Fourth Circuit reasoned, left

her ineligible to adjust her status under 8 U.S.C. § 1255.

Here, in contrast, the government has not argued that Petitioner's application was

substantively defective for any reason other than alleged fraud or willful misrepresentation under

§ 1182(a)(6)(C)(i).  It notes the role 8 C.F.R. § 103.2(a)(2) played in *Injeti*, Dkt. 11 at 31–32, but

it never alleges that Petitioner ran afoul of that regulation here or otherwise suggests that she

violated 8 U.S.C. § 1255.  Even in a case where the Court's review is *de novo*, the Court will not

consider at summary judgment an argument that the moving party has not presented.  *See, e.g.*,

*New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005) (per curiam); *Shands Jacksonville Med. Ctr. v.

Burwell*, No. 14-1477, 2015 WL 5579653, at *15 n.7 (D.D.C. Sept. 21, 2015).  But in any event,

the Court is not convinced by the rationale articulated in *Injeti*.  The regulation invoked in *Injeti*

provides that all applications must be signed and that by signing, the applicant "certifies under

penalty of perjury that the benefit request, and all evidence submitted with it, either at the time of filing or thereafter, is true and correct."  8 C.F.R. § 103.2(a)(2).  It is black letter law, however, that perjury requires intent.  *See, e.g.*, 18 U.S.C. § 1621 (defining perjury as reaching only those who "willfully" lie under oath or penalty of perjury); *Perjury*, Black's Law Dictionary (10th ed. 2014).  The regulation the Fourth Circuit relied on thus does not impose the "absolute" duty that court supposed, covering even innocent mistakes.

Interpreting 8 C.F.R. § 103.2(a)(2) and 8 U.S.C. § 1255 as Fourth Circuit did, moreover, would effectively read the scienter requirement out of 8 U.S.C. § 1182(a)(C)(6)(i), since the *Injeti* court's interpretation would subsume all misstatements on applications for immigration benefits without requiring any scienter.  The same is also presumably true for the materiality requirement in 8 U.S.C. § 1182(a)(6)(C)(i), given the breadth of the Fourth Circuit's rationale.  That is, if the "perjury" referred to in 8 C.F.R. § 103.2(a)(2) does not carry an *intent* requirement, then there is no reason it should import a *materiality* requirement either.  Thus, taken to its logical conclusion, the Fourth Circuit's rationale would seem to require USCIS to deny an application for citizenship where an applicant made a concededly innocent and immaterial mistake on an LPR application submitted years—or even decades—earlier.  The regulatory language, which is directed at the "signature" requirement for all benefit requests, is far too thin a reed to support such an extreme result.

The Fourth Circuit's decision in *Injeti* not only strains the legislative and regulatory language and structure, but it is also difficult to reconcile with *Castaneda-Gonzalez v. INS*, 564 F.2d 417 (D.C. Cir. 1977).  There, the D.C. Circuit considered whether the authority to revoke an immigrant's "labor certificate" based on a factual inaccuracy with the application rested with the Immigration and Naturalization Service ("INS") or the Secretary of Labor.  The Court concluded

21

the latter, *id.* at 423–25, and then considered the government's argument that this would prevent

the INS from deporting someone with a factual flaw in their application absent a showing of

fraud or willfulness under 8 U.S.C. § 1182(a)(19) (1970)—an inadmissibility provision identical

to § 1182(a)(6)(C)(i) for all relevant purposes, *id.* at 425.  Specifically, the INS argued that

exclusive reliance on the statutory provision would mean that "where a misrepresentation is not

willful, the Attorney General will be prevented from deporting [an alien] even though if the true

facts had been known the labor certificate would never have been issued."  *Id.* (alteration in

original) (internal quotation marks omitted).  The D.C. Circuit recognized that this was a correct

statement but disagreed with the INS's argument that this result was untenable.  To the contrary,

the Court noted that "Congress explicitly chose to require the government to prove willfulness

when seeking to deport an alien for misrepresenting facts in applying for entry documents."  *Id.*

The Court further explained that it would not allow the INS "to circumvent this congressionally-

imposed burden of proof" by finding an alien deportable for an innocent mistake on her

application.  *Id.*  The same logic applies here.  Congress has determined that an applicant for

adjustment to LPR status is inadmissible if she fraudulently or willfully misrepresents a material

fact.  *See* 8 U.S.C. § 1182(a)(6)(C)(i).  The Court will not allow USCIS to circumvent that statute

and find Petitioner inadmissible absent a showing that she acted fraudulently or willfully.

In sum, the government seems to assume that *any* defect in Petitioner's LPR Form, absent

a showing of an intent to mislead or even knowledge of the mistake, would render her

inadmissible.  That is incorrect.  Congress has prescribed the grounds upon which a Court may

find a substantive defect in an adjustment to LPR status, and a misstatement is only disqualifying

if it is intentional and material.  *See* 8 U.S.C. § 1182(a)(6)(C)(i).  The government has not relied

on any other statute that would render Petitioner's LPR status substantively defective and has not

shown that she had the scienter that § 1182(a)(6)(C)(i) requires.  Accordingly, the government's argument fails.

    b.  <u>The Government Overstates the Test for Materiality</u>

The Court further concludes that, even if a material misstatement could constitute an independent defect in Petitioner's LPR status, there remains a genuine dispute of material fact that precludes summary judgment on this theory.  Whether an omission or affirmative misrepresentation is material is a question of law.  *Kungys v. United States*, 485 U.S. 759, 772 (1988).  That legal determination, however, must be made in the context of a developed factual record.  Under the immigration laws, as in other settings, the test for materiality turns on whether the fact at issue "has a natural tendency to influence, or was capable of influencing, the decisions of the [government agency]."  *Id.* at 770 (internal quotation marks omitted).  This does not mean that the omission or misrepresentation "would *more likely than not* have produced an erroneous decision, or even that it would *more likely than not* have triggered an investigation."  *Id.* at 771 (emphasis in original).  The Attorney General has further explained:

> A misrepresentation made in connection with an application for visa or other documents, or with entry into the United States, is material if either (1) the alien is excludable on the true facts, or (2) the misrepresentation tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded.

*Matter of S– and B–C–*, 9 I. & N. Dec. 436, 447 (A.G. 1961).  Applying this standard, the government argues that Petitioner's failure to disclose that she had two children fathered by a man other than her husband is material because it "shut off a line of inquiry" into whether her marriage to Sy was a sham.  Dkt. 11 at 25–26.

Petitioner disagrees.  She argues that USCIS fully investigated the *bona fides* of her marriage back in 1998 when Sy filled out the I-130 Petition for an Alien Relative.  *See* Dkt. 15 at

6.  It was approximately five years later that she had her first child with N'Da, and nearly seven years had passed between when USCIS approved the I-130 Petition based on her marriage to Sy and when she failed to disclose her children.  Petitioner argues that USCIS was no longer interested in the *bona fides* of her marriage by the time she filled out the LPR Form and then had her LPR interview and her omissions were immaterial.

Neither party has it quite right.  Petitioner is incorrect that the *bona fides* of her marriage were no longer at issue at the time she applied for LPR status.  As the government notes, the "Secretary of Homeland Security may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved by him" under 8 U.S.C. § 1154, including an I-130 Petition for an Alien Relative.  8 U.S.C. § 1155.  Because the basis for Petitioner's application for LPR status was her I-130 approval, the government maintained both an interest in the merits of that application and the authority to revisit the *bona fides* of Petitioner's marriage to Sy.  To be sure, having two children with N'Da, five and seven years after her marriage to Sy, does not show that her marriage to Sy was a sham.  But, by the same token, the *bona fides* of that marriage were not resolved once and for all with the approval of Sy's I-130 Petition for Alien Relative in 1998.  Having learned for the first time that Petitioner had two children with another man while purportedly married to Sy, USCIS might reasonably have inquired, for example, whether Petitioner lived with Sy or N'Da and, if she lived with N'Da, when and why she stopped living with Sy.

At the same time, the government overstates the sweep of the test for materiality.  Petitioner's misrepresentation is material so long as it "tend[ed] to shut off a line of inquiry which [was] relevant to the alien's eligibility *and which might well have resulted in a proper determination that [s]he be excluded*."  *S– and B–C–*, 9 I. & N. Dec. at 447 (emphasis added).

As the Court reads the Attorney General's interpretation of "material," a misrepresentation only satisfies the test if there is some reasonable possibility that the applicant would have been denied admissibility.  As the Attorney General explained in *Matter of S– and B–C–*, the test asks, "[I]f a relevant line of inquiry has been cut off, might that inquiry have resulted in a proper determination that the alien be excluded?"  *Id.* at 449.  If the answer to this question is "no," then the misrepresentation is immaterial.  *Id.*  In the Attorney General's own words: "[W]here the government officials have made an adequate investigation after the misrepresentation became known, or have had reasonable opportunity to do so, an unrefuted showing of eligibility by the alien may be highly persuasive that the misrepresentation was not material."  *Id.*

Against this backdrop, the Court concludes that the legal question of materiality cannot be resolved in the present factual vacuum.  Although the Court agrees with the government that the *bona fides* of Petitioner's marriage to Sy remain relevant, there still remains the question whether Petitioner can make an "unrefuted showing" that her marriage was not a sham.  The Court, accordingly, concludes that it cannot resolve the question of materiality without a more complete factual record.

4.  *The Government Has Not Shown that Petitioner Had The Necessary Purpose*

Finally, the government's motion fails for a third reason: It has not shown the absence of a genuine dispute of material fact about whether Petitioner had the *purpose* that 8 U.S.C. § 1182(a)(6)(C)(i) requires—that she lied "to procure . . . a visa, other documentation, or admission into the United States."  There is nothing in the existing record that indicates *why* Petitioner omitted any mention of her child on the LPR Form or her children during her interview, and the government makes no effort to support its factual contention that Petitioner's omissions were motivated by a desire to gain admission.

Even if the government had proffered some evidence of this purpose, the Supreme Court

has held that an applicant's purpose in the immigration context "must be resolved by the trier of

fact." *Kungys*, 485 U.S. at 782 (opinion of Scalia, J.); *see also id.* at 780–81 (majority opinion).

The required showing may often follow from proof that an applicant lied with an intent to

defraud or mislead; in many contexts, the most likely explanation for why someone would

intentionally misrepresent a material fact on their application for admission may be that they

thought that fact would be harmful to their admission.  But it is not the only possible explanation.

Because 8 U.S.C. § 1182(a)(6)(C)(i) includes the element of purpose, and because subjective

motivation is a question of fact, *see id.*, the Court once again cannot find for the government in

the absence of uncontested record evidence supporting its position.  *See* Fed. R. Civ. P. 56.

**B.  Good Moral Character**

As recounted above, USCIS supplemented its denial of Petitioner's naturalization

application after she had already filed her petition for review with this Court.  The agency's

initial decision rejected her application only because she was not "lawfully admitted" when she

gained LPR status, but its supplemental decision determined that she was also ineligible for

naturalization because she lacked "good moral character," as required under the INA and the

governing regulations, *see* 8 U.S.C. § 1427(a); 8 C.F.R. § 316.10(a).  *See* Dkt. 11-6 at 7.  The

government now asserts that Petitioner's alleged lack of good moral character provides an

alternative basis to deny her petition for review.  *See* Dkt. 11 at 32–34.

As an initial matter, Petitioner argues that USCIS abused its discretion by purporting to

supplement its decision after she had already filed suit in this Court, particularly since all of the

relevant information was already before USCIS when it rendered its original determination.[3]

Dkt. 15 at 3.  The government did not respond to Petitioner's argument in its reply brief, nor has

it identified a source of authority that allows it to reopen a final administrative decision after an

applicant has petitioned for judicial review.  On the other hand, Petitioner has not addressed

whether the administrative record limits the arguments that the government may make in a *de

novo* proceeding under 8 U.S.C. § 1421(c).  Because the Court concludes that the government is

not entitled to summary judgment on the grounds that Petitioner lacks "good moral character," it

need not resolve this issue at this time.

        In addition to the requirement that an applicant for citizenship demonstrate that she has

been "lawfully admitted for permanent residence" in the United States for five years before

naturalizing, the law also requires that applicants be "of good moral character" for the five years

preceding their application as well as for the period of time following the filing of the

application.  8 U.S.C. § 1427(a).  The governing regulations further provide that "the applicant

for naturalization bears the burden of demonstrating that, during the statutorily prescribed period,

he or she has been and continues to be a person of good moral character."  8 C.F.R.

§ 316.10(a)(1).  The "good moral character" requirement must be evaluated "on a case-by-case

basis, taking into account the elements enumerated in [the statute and regulations] and the

standards of the average citizen in the community of residence."  *Id.* § 316.10(a)(2).  Assessing

an individual's moral character is, at least at times, a fact-intensive exercise.  *See Application of*

---

[3]  After USCIS reaffirmed its decision to deny Petitioner's application for naturalization, she
submitted an affidavit to this Court explaining why she believed her actions did not belie her
good moral character.  Dkt. 15-2 at 2.  Because that affidavit was submitted after USCIS
reaffirmed its decision, it could not possibly have provided a new predicate for the agency's
decision.

*Murra*, 178 F.2d 670, 677 (7th Cir. 1949) ("We suppose what constitutes 'good moral character,' as contemplated by the Naturalization Act, cannot be determined in any precise fashion; in fact, it is evident from a reading of the cases . . . that it is a matter of opinion which varies quite widely.").

The regulation lists a number of categorical rules, which treat certain conduct or background as disqualifying without exception.  Thus, for instance, a court "shall" find that anyone who has been "[c]onvicted of murder at any time" lacks good moral character.  8 C.F.R. § 316.10(b)(1)(i).  The same is true for anyone who in the previous five years has been convicted of most "crimes involving moral turpitude," and for anyone who violated most laws "relating to a controlled substance," or who "has practice[d] . . . polygamy," or, in the absence of a conviction, anyone who *admits* to having committed the illegal acts otherwise covered by the moral turpitude or controlled substance provisions, *id*. § 316.10(b)(2).

The regulation defining "good moral character" also contains a "catchall" provision, but with an important caveat.  It provides, in relevant part, that "[*u*]*nless the applicant establishes extenuating circumstances*, the applicant shall be found to lack good moral character if, during the statutory period, the applicant . . . [c]ommitted unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts, although the acts do not fall" within the regulation's preceding categories.  8 C.F.R. § 316.10(b)(3) (emphasis added).  By its terms, this subsection of the regulation is not categorical.  It instead offers a presumption, but one which the applicant can rebut by "establish[ing] extenuating circumstances."  *Id.*

The government identifies three reasons why, in its view, Petitioner lacks good moral character and is thus ineligible for naturalization.  First, it argues that she "willfully omitted her first child when she submitted her [LPR Form], even though the instructions were clear and she

knew she had had a child several months prior, who lived with her." Dkt. 11 at 32. The government notes that she made this misrepresentation under the penalty of perjury, implying that that too may be grounds to deny her application. *Id.* As the Court has already explained, however, there are genuine disputes of material fact about whether Petitioner's misrepresentations regarding her children were willful and whether she had the mental state necessary to show that she committed perjury. If she lacked the required state of mind, then she committed neither willful misrepresentation nor perjury, and thus she would not lack good moral character on this basis. That argument is therefore insufficient to warrant summary judgment, at least on the present record.

Second, the government argues that Petitioner also lacks good moral character because she signed the Naturalization Form without mentioning her second husband, N'Da. Dkt. 11 at 33. The government broadly asserts that this omission "preclude[s] [Petitioner] from establishing good moral character, and thus make[s] her ineligible to naturalize, under 8 C.F.R. § 316 and 8 U.S.C. § 1427(a)." *Id.* But the government's opening brief does not specify which of the provisions of 8 C.F.R. § 316 her false Naturalization Form allegedly triggers. Chapter 316 of Title 8 of the Code of Federal Regulations broadly covers all "General Requirements for Naturalization," and even assuming the government is relying on § 316.10 specifically, that provision provides myriad reasons an applicant may fail to demonstrate good moral character. Moreover, as the Court has explained, some of these reasons categorically bar an applicant, while the others permit an applicant to show extenuating circumstances. It is the government's burden at summary judgment to show that it "is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), and without offering more specificity as to why it believes that Petitioner lacks

good moral character under the statute, the government has not met its burden.  The government

has, accordingly, failed to justify its claim to summary judgment on that basis as well.

Finally, the government contends that Petitioner lacks good moral character under the

catchall provision, 8 C.F.R. § 316.10(b)(3), because she "attempted to conceal, harbor, or shield

from detection" an illegal alien in violation of 18 U.S.C. § 1324(a)(1)(A)(iii) when she did not

list N'Da on her Naturalization Form.  Dkt. 11 at 34.  This conduct, the government argues,

"reflect[s] her defiance of and unwillingness to comply with the law, as well as her propensity to

conceal facts from law enforcement officials and immigration authorities to protect herself and

others."  *Id.*  The government further argues that Petitioner has not shown any extenuating

circumstances, and so she has failed to demonstrate good moral character under

§ 316.10(b)(3)(iii).

Even accepting the government's assertion that Petitioner attempted to conceal her

husband's illegal presence in the United States, that violation must be balanced against "the

standards of the average citizen in the community of residence," *id.* § 316.10(a)(2), and the Court

must consider "extenuating circumstances," *id.* § 316.10(b)(3).  The Court has already explained

why it cannot yet determine whether Petitioner's omissions on her LPR Form and during her

LPR interview were deliberate or were mistakes.  For the same reasons, it cannot determine on

the present record whether the omission on her Naturalization Form was the most recent example

in a pattern of misconduct or a first-time misstep by someone who has spent nearly two decades

in this country.  Similarly, the current record does not reveal precisely what occurred when

Petitioner corrected her misstatement on her Naturalization Form by revealing her husband

during her Naturalization interview.  *Cf. Murra*, 178 F.2d at 678 (finding it relevant in good

moral character analysis that the applicant did "all in his power to rectify the wrong").  The

Court, accordingly, concludes that this fact-intensive inquiry requires a more complete record and would benefit from a hearing that would permit Petitioner to tell her story but also subject her to cross-examination.  In any event, in light of the uncertain factual record, the Court concludes that the government has not met its burden on summary judgment.

## IV.  CONCLUSION

As explained above, the Court concludes that there remain genuine disputes of material fact as to whether Petitioner was "lawfully admitted" or lacked "good moral character" for purposes of naturalization.  The government's motion for summary judgment is, accordingly, **DENIED** without prejudice.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  January 20, 2016